IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

YOUKHANNA O. DAVID,                 )
                                    )
                Plaintiff,          )        Case No. 05 C 1093
                                    )
        v.                          )        Magistrate Judge
                                    )           Martin C. Ashman
JO ANNE B. BARNHART,                )
Commissioner of Social Security,    )
                                    )
                Defendant.          )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Youkhanna O. David, seeks judicial review of the final decision of the

Defendant, Jo Anne B. Barnhart, Commissioner of the Social Security Administration

("Commissioner"), who determined that Plaintiff was not entitled to Disability Insurance Benefits

("DIB") or Supplemental Security Income ("SSI"). Before this Court is Plaintiff's Motion for

Summary Judgment or Remand, which requests this Court to reverse the Commissioner's

decision that Plaintiff was not entitled to DIB or SSI, and remand Plaintiff's case for further

determination of disability. The Commissioner's Motion for Summary Judgment, which requests

this Court to affirm her decision, is also before this Court. The parties have consented to have

this Court conduct any and all proceedings in this case, including the entry of final judgment.

*See* 28 U.S.C. § 636(c); Local R. 73.1(b). For the reasons set forth below, the Court affirms the

Commissioner's decision.

## I.   Background

### A.   Procedural History

Plaintiff applied for SSI benefits on August 4, 2000, and then subsequently became eligible for DIB on January 2, 2001. (R. at 16, 141.) Because Plaintiff's application for SSI was treated as an application for all benefits, when ruling on Plaintiff's instant claim, the Commissioner deemed Plaintiff to have concurrent applications. (R. at 16.) Plaintiff alleged a disability onset on November 15, 1998, due to disorders of the back and anxiety related disorders. (R. at 23.) Plaintiff's claim was denied initially on November 30, 2000, and again upon reconsideration on May 7, 2001. (R. at 25, 30.) Plaintiff filed a timely request for a hearing before an Administrative Law Judge. (R. at 33.) At a hearing held on January 16, 2003, before Administrative Law Judge Maren Dougherty ("ALJ"), Plaintiff testified with the assistance of an interpreter and was represented by his attorney, Marcie E. Goldbloom. (R. at 402.) Psychologist Mark Oberlander, Ph.D., provided testimony as a medical expert ("ME"), as did vocational expert Frank Mendrick ("VE"). (R. at 16, 402, 446, 456.) The ALJ denied Plaintiff's claim on August 28, 2003. (R. at 14, 22.) Plaintiff timely requested review of the ALJ's decision and, on November 26, 2004, the Social Security Appeals Council denied review of the ALJ's decision, making the ALJ's decision the Commissioner's final decision. (R. at 6.)

### B.   Plaintiff's Background

Plaintiff was born on June 6, 1960, and was forty-two years old at the time of his ALJ hearing. (R. at 139.) Plaintiff was born in Syria, where he received formal education through the eleventh grade. (R. at 154, 407.) Plaintiff himself is ethnically Assyrian and English is his

- 2 -

second language. (R. at 408.) Plaintiff is not a U.S. citizen but has lived in the U.S. since 1995 and is lawfully admitted for permanent residence. (R. at 139.) Plaintiff lives with his seventy year old mother. (R. at 157.) All of Plaintiff's prior work experience in the United States has been in maintenance. (R. at 157, 161, 409.)

### C.    Medical Evidence

Plaintiff claims that he was injured in November 1998. On December 21, 1998, Yevgeny Tsyrulnikov, M.D., examined Plaintiff and observed mild abnormalities in the spine, specifically tenderness at L1-L5 of Plaintiff's spine, and tenderness and spasm in the thoracolumbar paraspinal musculature bilaterally, as well as sacroiliac and sacrospinalis bilaterally. (R. at 196, 205.) Plaintiff reported severe pain radiating through his hip, thigh, knee, and into his right calf, describing it as constant, burning, sharp, and related to activity. (R. at 206, 208, 211, 220.) Plaintiff also reported increased anxiety and sleep disturbance after his injury. (R. at 209.) Dr. Tsyrulnikov diagnosed Plaintiff with slight post-traumatic anxiety and an acute lumbosacral musculoligamentous sprain, ruling out a herniated disc. (R. at 217.)

Plaintiff continued to receive treatment from Dr. Tsyrulnikov for low back pain, including seven nerve block injections between December 1998 and March 1999. (R. at 198-202, 221-25, 227-28.) As of January 21, 1999, Dr. Tsyrulnikov suggested that Plaintiff could return to work but recommended that he avoid lifting more than twenty pounds, pulling, pushing, repetitive bending, or working overhead. (R. at 224, 232, 235.) On February 4, 1999, Dr. Tsyrulnikov increased the weight limit to thirty pounds with the same restrictions. (R. at 223, 233.) On February 22, 1999, a magnetic resonance imaging ("MRI") indicated a disc

- 3 -

herniation and disc dehydration at L5-S1 that effaced the epidural fact and abutted the thecal sac. (R. at 236.)

On September 15, 2000, Demetrios Giokaris, M.D., completed two examination reports on Plaintiff for the Commissioner. (R. at 240-248.) Dr. Giokaris observed decalcification and vertebral ankylosis at L5-S1 and also evidence of nerve root compression identified though positive bilateral straight leg raise tests. (R. at 248.) Dr. Giokaris recommended spinal surgery. (R. at 243.) Upon examination of Plaintiff, Dr. Giokaris identified restricted flexion and extension of the lumbosacral spine with paravertebral muscle spasm in addition to decreased sensation and reflexes in the left leg. (R. at 245, 248.) Paresis in the lower extremity was two left and three right and there was muscle atrophy in the left thigh amounting to a two inch decrease in circumference. (R. at 245.) Fatigue of the left leg was rated at two/three and Plaintiff was noted to have some lingering in his gait and was unable to ambulate more than thirty feet without assistance. (R. at 245, 247.) Dr. Giokaris found Plaintiff had unlimited manipulative ability, but found Plaintiff's ability to do work-related activities such as sitting and standing as "very limited." (R. at 246, 248.) Dr. Giokaris also noted that Plaintiff suffered from depression and anxiety. (Id.)

On September 27, 2000, nonexamining state agency physician Virgilio Pilapil, M.D., reviewed the medical record and found that Plaintiff had a residual functional capacity ("RFC") for sedentary work with occasional postural restrictions, with the exception that he could never climb ladders, ropes, or scaffolds. (R. at 249-56.) Dr. Pilapil concluded Plaintiff retained the ability to lift and carry up to ten pounds occasionally and less than ten pounds frequently. (R. at 250.) Furthermore, Plaintiff could stand and/or walk with normal breaks for at least two hours,

- 4 -

and sit with normal breaks for about six hours in an eight-hour workday. (Id.) Dr. Pilapil found no manipulative, visual, communicative, or environmental limitations. (R. at 252-53.) Dr. Pilapil concluded that Plaintiff retained the ability to work. (R. at 255-56.)

On October 20, 2000, Argelia Prieto, M.D., performed a thirty-five minute psychiatric consultative examination of Plaintiff at the request of the state agency. (R. at 257-59.) Plaintiff complained of back pain, depression, anxiety, and panic attacks and reported that his current medications of Prozac and Klonopin were helping his symptoms. (R. at 257-58.) Plaintiff claimed to sleep eight hours per night and denied hearing voices, having visual hallucinations, or having suicidal ideation or intent. (R. at 257.) Dr. Prieto reported that Plaintiff stayed indoors in order to avoid panic attacks and that Plaintiff's mood was anxious and his speech was pressured and loud but well articulated. (R. at 258.) Regarding Plaintiff's daily activities, Dr. Prieto noted that Plaintiff did not cook but helps with household chores, watches television without problems, and felt that he could concentrate enough to read a book. (Id.) Dr. Prieto gave Plaintiff a guarded prognosis and diagnosed Plaintiff with generalized anxiety disorder with panic attacks and major depression without psychosis. (R. at 259.)

On November 13, 2000, state agency psychologist David Gilliland, Psy.D., reviewed the medical record and found that Plaintiff had an anxiety related disorder that caused mild restrictions of daily living and difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. (R. at 260-77.) Dr. Gilliland concluded that Plaintiff was not significantly limited in thirteen out of twenty work-related areas of mental functioning, that Plaintiff was moderately limited in the ability to carry out detailed instructions, and that the record contained no evidence of limitation with respect to the remaining

- 5 -

six areas of mental functioning. (R. at 260-61.) Dr. Gilliland was reluctant to accept Dr. Prieto's diagnosis of major depression without psychosis because Dr. Prieto did not describe any symptoms of depression, and rather than observing any depressed effects, observed only anxious effects. (R. at 276.) Dr. Gilliland opined that Plaintiff was mentally capable of performing simple, repetitive tasks and unskilled work during the course of a normal work week. (R. at 262.)

On February 21, 2001, Dr. Giokaris again completed two reports for the Commissioner. (R. at 278-83.) Dr. Giokaris noted that Plaintiff appeared quiet, sad, and nervous. (R. at 279-80.) Plaintiff complained of difficulty sleeping and depression, which he claimed worsened after his back injury. (R. at 279.) Furthermore, Dr. Giokaris noted that Plaintiff's mother did most of the chores at home, except for the grocery shopping. (Id.) Plaintiff would shop for his mother but avoided purchasing items weighing more than ten to fifteen pounds. (Id.) Dr. Giokaris diagnosed Plaintiff with major depression with anxiety and spinal radiculopathy. (R. at 281-82.) Dr. Giokaris observed an anatomical deformity, bone destruction and bone hypertophy in Plaintiff's lumbar spine. (R. at 282.) Other abnormalities Dr. Giokaris reported were: muscle atrophy in Plaintiff's legs; lumbar spine tenderness, stiffness, and muscle spasm; limitation of movement; and continuation of pain despite medication. (Id.) Plaintiff also had reduced grip strength bilaterally and a limited capacity for gross manipulation bilaterally due to radiating back pain. (R. at 282-83.) Dr. Giokaris noted that, although Plaintiff could ambulate normally, he could not walk more than one block without stopping. (R. at 283.) Dr. Giokaris recommended that Plaintiff undergo a laminectomy and laboratory tests. (Id.) Dr. Giokaris

concluded that Plaintiff was "very limited" both physically and psychologically due to his back pain and depression and could not do meaningful work. (R. at 281, 283.)

On March 26, 2001, Harley G. Rubens, M.D., performed a forty-minute consultative psychiatric examination of Plaintiff. (R. at 284-86.) At the time, Plaintiff was taking Prozac, 40 mg per day, and Lorazepam, 25 mg three times per day, and reported panic attacks, tightness in his chest, restless sleep, and back pain. (R. at 284-85.) Plaintiff reported that he lives with his mother and does some cleaning around the house, though his mother and sister do most of the cooking. (R. at 284.) Plaintiff also reported going to coffee shops, watching television for about an hour per day (but his back would get sore), and walking a couple of blocks. (R. at 284-85.) Dr. Rubens observed that despite Plaintiff being mildly anxious, Plaintiff was attentive and had good concentration. (R. at 286.) Plaintiff also performed well on calculation exercises (serial threes and sevens), as well as recent memory and judgment tests. (R. at 285-86.) Dr. Rubens diagnosed Plaintiff with (1) panic disorder without agoraphobia, in partial remission, and (2) adjustment disorder with mixed anxiety and depression. (R. at 286.) Dr. Rubens noted that Plaintiff reported minor panic attacks for two years prior to the examination date and "[ran] his life a lot around the fact that he has some pain." (Id.)

On April 20, 2001, state agency psychiatrist Erika B. Altman, Ph.D., reviewed the evidence of record and concluded that Plaintiff did not have a medically determinable mental impairment. (R. at 287.) Dr. Altman opined that Plaintiff had mild restrictions in daily living activities, mild difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation. (R. at 297.)

Plaintiff continued to seek treatment from Dr. Giokaris for back pain, depression and anxiety on a monthly basis from October 2001 to July 2002.[1] (R. at 302-05.) In March 2002, Plaintiff reported that his prescription pain medication was not helping, (R. at 304), and sought physical therapy at Cook County Hospital. (R. at 317-19, 351.)

In November 2001, physicians at Cook County's Fantus Clinic took an x-ray of Plaintiff's lumbar spine. (R. at 324.) According to the x-ray report, frontal and two lateral views of Plaintiff's spine showed no evidence of acute fracture or subluxation, and the alignment of the vertebral bodies was unremarkable. (Id.) No oblique views were available. (Id.)

In August 2002, Dr. Giokaris completed a Physical RFC Questionnaire in which he repeated his previous diagnosis and findings that Plaintiff's pain and other symptoms interfered with his ability to work. (R. at 307-10.) Dr. Giokaris listed Plaintiff's prognosis as guarded and noted that Plaintiff may need surgery. (R. at 307-08.) Regarding Plaintiff's functional limitations, Dr. Giokaris opined that Plaintiff could not work and specifically found that Plaintiff can walk only half a city block without rest, could sit or stand for thirty minutes without interruption, and could sit or stand/walk for less than two hours each during an eight-hour work day. (R. at 308-09.) In addition, Plaintiff would need to alternate sitting and standing with periods of walking for ten minutes every thirty minutes. (R. at 308.) Dr. Giokaris opined that Plaintiff could lift up to ten pounds occasionally and perform repetitive reaching, fingering and handling for only 20-30% of the workday. (R. at 309.) Bending would only be permitted 1% of the day, with all twisting precluded. (Id.)

---

[1] In his notes, Dr. Giokaris reports that Plaintiff sought treatment from him every month for several years. The records submitted to the Social Security Administration, however, do not include documentation of that many visits.

That same day, Dr. Giokaris completed a Mental Impairment Questionnaire stating that

he had seen Plaintiff approximately once a month for the last two or three years. Dr. Giokaris

again stated that Plaintiff suffered from major depression and that he provided free samples of

medication to Plaintiff, and that Plaintiff could not afford medications if he had to pay for them.

(R. at 311.) Dr. Giokaris found that Plaintiff had "no useful ability to function" in performing at

a consistent pace without an unreasonable number and length of rest periods and could not deal

with normal work stress. (R. at 313.) Dr. Giokaris also found that Plaintiff was "seriously

limited, but not precluded" in the following seventeen of twenty-four areas of work-related

mental functioning: remember work-like procedures; understand and remember very short and

simple instructions; maintain attention for a two-hour segment of time; maintain regular

attendance and be punctual; sustain an ordinary routine without special supervision; work in

coordination with, or proximity to, others without being unduly distracted; make simple

work-related decisions; complete a normal work-day and work-week without interruptions from

psychologically based symptoms; accept instructions and respond appropriately to criticism from

supervisors; get along with coworkers or peers without unduly distracting them or exhibiting

behavioral extremes; respond appropriately to changes in a routine setting; and be aware of

normal hazards and take appropriate precautions. (Id.) Dr. Giokaris also stated that Plaintiff

would be absent from work for more than four days per month due to his impairments, that he is

not a malingerer, and that his chronic pain cycles with his depression. (R. at 315.) He also noted

that Plaintiff had three episodes of decompensation of at least two weeks within the prior

twelve-month period. (R. at 314.)

Following the ALJ hearing, on March 10, 2003, orthopedic surgeon Richard Shermer, M.D., examined Plaintiff at the request of the ALJ and, after reviewing the record, diagnosed Plaintiff with lumbosacral degenerative disc disease. (R. at 354.) Dr. Shermer detected no spasm in Plaintiff's lumbar musculature and found no signs of radiculopathy or atrophy. (R. at 353-54.) Lumbar range of motion was within normal parameters. (R. at 355.) Plaintiff demonstrated "excellent" strength in his lower extremities. (R. at 354.) Plaintiff's quadriceps, hamstrings, and calf muscles showed no atrophy or asymmetry. (Id.) No abnormalities were detected in Plaintiff's upper extremities. (R. at 355.) Dr. Shermer opined that Plaintiff could lift and carry fifty pounds occasionally and twenty pounds frequently. (R. at 357-60.) Dr. Shermer also stated that Plaintiff's ability to walk was not affected by his impairment, and that Plaintiff could occasionally climb, balance, kneel, crouch, stoop, but never crawl. (R. at 358.)

On March 12, 2003, two days after being examined by Dr. Shermer, Plaintiff appeared in an emergency room complaining of pain and difficulty breathing. (R. at 362-69.) At that time, Plaintiff had an old prescription of Lorazepam that he used occasionally. (R. at 368.) He was administered an anti-anxiety medication and released. (R. at 369.) Records from Ravenswood Hospital, Cook County Hospital, and Swedish Covenant indicate that Plaintiff visited emergency rooms at least eleven other times between 1998 and 2003 with a variety of complaints, including anxiety, shortness of breath, and symptoms associated with hemorrhoids and gastritus. (R. at 237, 333-34, 336, 338-39, 340, 370, 379, 386.) Plaintiff also sought emergency treatment for lower back pain in April 2001. (R. at 344.)

## D.    Plaintiff's Testimony

At the January 16, 2003 ALJ hearing, Plaintiff testified that the Syrian Universal Alliance church pays him $200.00 per month to take care of his elderly mother by performing tasks such as taking her to the doctor, purchasing her medicine and going shopping for her. (R. at 408-09, 421.) Plaintiff stated that it takes him two to four hours to clean his house and wash dishes, and he takes rest breaks every thirty minutes or so. (R. at 418.) He also stated that he buys light groceries from a store one block away and does laundry, one load at a time, at a laundromat across the street. (R. at 418, 440.)

Plaintiff described his panic attacks as making it difficult for him to breathe and lasting anywhere from two to five hours. (R. at 412.) According to Plaintiff, his attacks occur about twice a week, whereas two or three years prior to the hearing they occurred daily. (R. at 412-13.) Plaintiff receives free samples of medication which allow him to feel better in two to three hours. (R. at 413.) These medications include Celebrex, Lorazepam and Paxil. (R. at 429-33.) Plaintiff is aware that he can receive free psychiatric care from Cook County's Fauntas Clinic and goes there a few times a year to get medications, though he chooses not to use their services. (R. at 425-26, 429-30.) Plaintiff described his back pain as a burning feeling originating in his middle to lower back and radiating to his legs. (R. at 414-15.) Plaintiff stated that to relieve his back pain he takes medication and may soak in the bathtub for an hour. (R. at 415, 435.) Plaintiff's pain medication includes Advil and Tylenol. (R. at 434-35.) Plaintiff watches television for thirty minutes at a time, but then needs to relax in bed for a few hours before he gets up and moves around. (R. at 415.) Plaintiff claimed that he needs to rest for about five minutes after walking one or two blocks because of pain in his back and legs and because of depression and

- 11 -

difficulty breathing. (Id.) Plaintiff goes to Syrian coffee shops with friends, but only for a few hours at a time due to his pain and depression. (R. 416-17.) Plaintiff also complained of having difficulty sleeping and feeling fatigued. (R. at 415-16.)

## E.     ME's Testimony

The ME testified at the January 16, 2003 administrative hearing and stated that Plaintiff had a generalized anxiety disorder, not otherwise specified. (R. at 448-49.) After reviewing the record and being present throughout the hearing, the ME did not believe that Plaintiff had a panic disorder because the symptoms described by Plaintiff during his testimony, as well as the psychiatric evaluations, did not document traditional patterns or symptoms of panic disorders. (R. at 449.) Furthermore, the ME found that Plaintiff's anxiety disorder does not meet or equal the listing severity. (Id.) The ME opined that Plaintiff would have only mild difficulty maintaining social functioning and would have moderate difficulty in maintaining concentration, persistence or pace. (R. at 450.) The record contained insufficient evidence of repeated episodes of decompensation of extended duration. (Id.) The ME found that Plaintiff did not meet the criteria of paragraph C of Listing 12.06. (R. at 450-51.) Based solely on psychiatric grounds, the ME opined that Plaintiff retained the ability to engage in routine, unskilled work. (R. at 451-52.) Finally, the ME hypothesized that due to language difficulties Plaintiff reports pain and depression to be synonymous, and as a result, many of Plaintiff's examining clinicians may have been mislead to diagnosing depressive disorders. (R. at 454-56.)

## F.    VE's Testimony

After hearing Plaintiff's testimony and reviewing the entire record, the VE analyzed hypotheticals posed by the ALJ. (R. at 457-68.) In Hypothetical One, the ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, work experience, and education who was limited to lifting twenty pounds occasionally and ten pounds frequently and sitting, standing or walking as required in a job. (R. at 457-58.) The individual could not bend or twist, nor perform detailed or complex tasks. (R. at 458.) The VE stated that positions available to such an individual in the Chicagoland area include 10,000 jobs requiring light level of exertion, 4,000 general inspection positions and 8,000 hand packing positions. (Id.) The VE further stated that his conclusion was consistent with The Dictionary of Occupational Titles. (R. at 460.) In Hypothetical Two, the VE was asked whether the individual from Hypothetical One could find work if he was required to change positions every forty-five minutes to an hour in a job that only occasionally requires walking more than two or three blocks at a time. The VE answered yes because some of the jobs he named, including 1,000 inspection positions and 2,000 packing positions, would allow for a stool to be placed in the work area. (R. at 457-59.) In Hypothetical Three, the individual from Hypothetical Two needed to change positions every thirty minutes. The VE stated that such a person's ability to work would depend on the individual's ability to perform fifty minutes of work every hour. (R. at 459.) Plaintiff's attorney proposed a fourth hypothetical in which the individual's pain and other symptoms are severe enough to interfere with his attention and concentration for up to two-thirds of the workday. (R. at 460-62.) The VE testified that such an individual would be unable to work unless he could maintain sustained attention for a full eight hours a day (personal breaks and lunches excluded). (R. at 461-62.)

Finally, the VE testified that, for many individuals, meeting production and pace requirements is stressful in and of itself and that, in a factory environment, more than one absence per month is not tolerated. (R. at 464-68.)

## II.   ALJ's Findings

The ALJ made the following specific findings:

1.    The claimant has not engaged in any disqualifying substantial gainful activity.

2.    The claimant has the following medically determinable impairments: a history of herniated disk with lumbar strain and a generalized anxiety disorder. The claimant's impairments significantly limit his ability to perform basic work activities.

3.    The claimant's impairments do not meet the requirements or equal the level of severity contemplated under any listing included in Appendix 1 to Subpart P, Regulations No. 4.

4.    The claimant's complaints of disabling symptoms and limitations are not entirely credible for the reasons set forth in the body of this decision.

5.    The claimant's medically determinable impairments preclude the following work related activities: lifting more than 20 pounds occasionally or more than 10 pounds frequently and understanding, remembering and/or carrying out detailed and/or complex

instructions. Based on those limitations, the claimant's residual
functional capacity is for a limited range of light work.

6.  The claimant is unable to perform any past relevant work.

7.  The claimant is within the younger age category.

8.  The claimant has a "limited" education.

9.  The claimant's past relevant work provided some skills, but those
    skills do not transfer to other occupations within the claimant's
    residual functional capacity.

10. Considering the claimant's medical/vocational profile, there is still
    a significant number of jobs in the regional economy that he is able
    to perform as cited in the body of this decision.

11. The claimant is not under a "disability" for the purposes of Titles II
    and XVI of the Social Security Act. (R. at 21-22.)


## III. Discussion

### A.    Standard of Review

The Commissioner's decision must be affirmed if it is supported by substantial evidence.
*Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); 42 U.S.C. § 405(g). Evidence is considered
substantial if a reasonable person would accept it as adequate to support a conclusion. *Young v.
Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). In this substantial-evidence determination, the
Court considers the entire record but may not reweigh evidence, resolve conflicts in the record,
decide questions of credibility, or in general, substitute its own judgment for that of the

Commissioner. *Lopez v. Barnhart*, 336 F.3d. 535, 539 (7th Cir. 2003). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is disabled, the Commissioner has the responsibility of resolving those conflicts. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the Court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Id.*

While the standard of review is deferential, the Court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). In order for the Court to affirm a denial of benefits, the ALJ must articulate the reasons for her decision at some minimal level. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ must build a logical bridge from the medical and testimonial evidence to her ultimate conclusion. *Id.* Although the ALJ need not address every piece of evidence, the ALJ cannot limit her discussion to only that evidence that supports her ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must confront the evidence that does not support her conclusion and explain why it was rejected. *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). The ALJ's decision must allow the Court to assess the validity of her findings and afford for a meaningful judicial review. *Dixon*, 270 F.3d at 1176.

## B.    Five-Step Inquiry

In order to qualify for disability payments, an individual must meet the statutory standard for disability, which requires the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected

to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A). The Social Security Act defines inability to engage in any substantial gainful activity as not only unable to perform previous work but unable to engage in any other kind of substantial work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Social Security regulations provide a five-step sequential inquiry to determine whether a claimant is disabled. The five steps are:

1.     Is the claimant currently engaged in substantial gainful activity? If yes, the claimant is not disabled. If no, the inquiry proceeds to Step 2.

2.     Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least twelve months? If no, the claimant is not disabled. If yes, the inquiry proceeds to Step 3.

3.     Does the claimant have an impairment that meets or equals the impairments listed as disabling in the appendix of 20 C.F.R. § 404, Subpt. P, App. 1? If yes, the claimant is disabled. If no, the inquiry proceeds to Step 4.

4.     Is the claimant able to perform his past relevant work? If yes, the claimant is not disabled. If no, the inquiry proceeds to Step 5.

5.     Is the claimant able to perform any other work in the national economy? If yes, the claimant is not disabled. If no, the claimant will be found disabled.

20 C.F.R. §§ 404.1520; 416.920. If the ALJ determines that the claimant is not disabled at any step of the five-step inquiry, the inquiry ends without proceeding to the next step. Id. At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's RFC. The RFC is an assessment of what work-related activities the claimant can perform despite his limitations. *Dixon*, 270 F.3d. at 1178; 20 C.F.R. §§ 404.1545; 416.945 ("Your residual functional capacity is the most you can still do despite your limitations."). The RFC must be based on all the relevant evidence in the record. 20 C.F.R. §§ 404.1545; 416.945. When performing this assessment, the ALJ must consider all of the claimant's medically determinable impairments of which he is aware, including those which are not severe. Id.

The claimant bears the burden of proof through Step 4 of the five-step inquiry. The claimant's burden of proof includes providing medical evidence to substantiate his assertion of disability. 20 C.F.R. § 404.1512(a). *See also Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994). At Step 5, the burden shifts to the Commissioner to demonstrate that the claimant can successfully perform a significant number of jobs that exist in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2004).

## C. Argument

Plaintiff challenges the ALJ's findings on four grounds. Plaintiff argues that the ALJ committed legal error by: (1) rejecting the evaluations of Dr. Giokaris, Plaintiff's treating and examining physician; (2) failing to perform a proper assessment of Plaintiff's mental RFC; (3) failing to follow the rules and regulations in making a credibility determination; and

(4) failing to include any of the functional limitations noted by the ME in her hypothetical questions to the VE. Each of these arguments in addressed in turn.

1. The ALJ Did Not Err When She Decided Not To Give Controlling Weight To A Treating Physician's Opinion.

Dr. Giokaris treated Plaintiff for approximately two years (meeting with him about once per month from 2001 to 2002), and is Plaintiff's treating physician. When an ALJ weighs conflicting evidence, a treating physician's opinion regarding the nature and severity of a medical condition is generally entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Generally, the longer a treating source has treated a claimant, the greater the weight given to his opinion. *Id.*; 20 C.F.R. § 404.1527(d). According to Social Security regulations, if an ALJ chooses not to give controlling weight to a treating physician's opinion, she must provide good reasons for the weight given to that opinion and specifically consider length of treatment relationship, frequency of treatment, nature and extent of treatment relationship, supportability, consistency, and specialization. 20 C.F.R. § 404.1527(d). The weight given to a treating physician cannot be implied: the decision must be sufficiently specific to make clear to any subsequent reviewers the weight the ALJ gave to the treating source's medical opinion and the reasons for that weight. Social Security Regulation ("SSR") 96-2p.[2]

---

[2] SSRs do not have force of law but are binding on all components of the Social Security Administration. 20 C.F.R. § 402.35(b)(1). *See also Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

- 19 -

Despite Dr. Giokaris's status as a treating physician, the ALJ found that his submissions were not entitled to controlling weight because they were inconsistent with other medical evidence in the record, inconsistent with Dr. Giokaris's own description of the frequency of Plaintiff's complaints and course of treatment, and inconsistent with Plaintiff's testimony regarding his physical abilities and daily activities. (R. at 18-20.) In her decision, the ALJ rejected the significance of Dr. Giokaris's September 2000 radiculopathy and left sciatica diagnoses and his August 2002 report of muscle spasms, limited motion, and positive straight leg raising test because these findings were inconsistent with Plaintiff's March 2002 physical therapy evaluation, where he was observed to ambulate normally, bend forward 90 degrees (albeit with pain), and his straight leg raise was negative, with only mild pain elicited with palpation to the lower back, and inconsistent with Plaintiff's March 2003 consultative evaluation, where he was able to heel and toe walk, ambulate without difficulty and squat fully. (R. at 18.) In fact, at the March 2003 exam, radiculopathy was specifically excluded from the diagnosis as a neurological exam was negative. (Id.) The ALJ also noted that Plaintiff's examination in an emergency room two days after the March 2003 exam was completely unremarkable except for a diagnosis of low back strain. (Id.)

Next, the ALJ questioned whether Dr. Giokaris's notes supported his description of Plaintiff's complaints and treatment. In particular, the ALJ stated that (1) Dr. Giokaris's treatment notes belie assertions of the frequency of complaints, supportive findings, and course of treatment, and (2) Dr. Giokaris's description of Plaintiff as essentially housebound and dependent on his mother is contradicted by evidence that Plaintiff goes shopping, does laundry, socializes in coffee houses with friends for hours at a time, and is paid to help care for his

mother. (R. at 19-20.) The ALJ also noted significant discrepancies between Dr. Giokaris's mental assessment and other evidence in the record, and those issues are discussed in Section III.C.ii below.

Based on this analysis, the ALJ concluded that Dr. Giokaris's observations may have been more accurate with regard to Plaintiff's physical condition in 1998 and 1999, during the acute phase of Plaintiff's pain, but that Plaintiff had improved significantly by 2001 and 2002. (R. at 19-20.) The ALJ pointed out that, despite Plaintiff's testimony that his condition had improved and significant evidence suggesting that Plaintiff's acute phase had ended, Dr. Giokaris's 2001 RFC was more restrictive than Plaintiff's limitations in 1999. (R. at 19-20, 233.) Accordingly, the ALJ did not restrict Plaintiff's RFC in an attempt to conform to Dr. Giokaris's findings.

Plaintiff argues that the ALJ's rejection of Dr. Giokaris's physical assessment is flawed because the ALJ (1) failed to identify how much weight she gave Dr. Giokaris's opinion, (2) erroneously attributed reports from January and February 1999 to Dr. Giokaris, (3) improperly assumed that Plaintiff's back pain cannot worsen over time, (4) improperly found that Plaintiff's disc herniation and dehydration resolved with conservative treatment, and (5) gave undue weight to Plaintiff's daily activities and to medical reports from a physical therapist, an emergency room, and an examining physician whose opinions were never provided to Dr. Giokaris for analysis. (Pl.'s Br. at 15-18.) Plaintiff also contends that the ALJ misrepresented Dr. Giokaris's mental findings when she suggested that Dr. Giokaris considered Plaintiff to be unmotivated, as opposed to depressed. (Pl.'s Br. at 18.)

Plaintiff's arguments fail to persuade the Court to reverse the ALJ's findings. First, while the ALJ did not explicitly state how much weight she gave Dr. Giokaris's findings, she pointed

out what she considered to be significant flaws in his reports and stated that his findings are not entitled to controlling weight and do not justify greater limitations on Plaintiff's capacities than those identified by the ALJ. These statements provide a fair understanding of the weight given to Dr. Giokaris's findings and a more specific statement is not necessary.

Next, the Court finds any confusion regarding the January and February 1999 reports was harmless error that does not change the ALJ's analysis. As Plaintiff argues, it does appear that the ALJ incorrectly attributes a few pages of Dr. Tysrulnikov's medical findings to Dr. Giokaris; pages that include Dr. Tysrulnikov's restriction of no lifting more than twenty to thirty pounds, repetitive bending, pushing, pulling, or working overhead. (R. at 18, 232-35.) This mistake detracts from the ALJ's theory that Dr. Giokaris's limitations for Plaintiff were "apt during the acute phase [January to March 1999] . . . but not post recovery," (R. at 19), and that Dr. Giokaris was internally inconsistent when he increased the limitations on Plaintiff's physical limitations. This mistake does not, however, remedy the significant contradictions between Dr. Giokaris's findings and the findings of other medical examiners and Plaintiff's daily activities. In fact, the ALJ's mistake suggests that the ALJ never found any of Dr. Giokaris's findings to be particularly accurate. In short, this was not a harmful error as there were other significant inconsistencies in the record that justified the ALJ's refusal to give the treating physician's opinion controlling weight. *See* 20 C.F.R. § 404.1527(d).

Plaintiff presses this issue, and argues that the ALJ incorrectly assumed that Plaintiff's back impairments would not worsen over time when she found that Plaintiff's acute back problems were largely resolved with conservative treatment and that medical findings that may have been appropriate in 1999 would no longer be accurate in 2001. (R. at 19.) Plaintiff claims

that his treatment was conservative only because he lacked the financial means to have surgery and other recommended procedures and that there is no evidence that his back problems were resolved, as his last MRI or x-ray was taken in 1999. First of all, when the ALJ refers to the resolution of Plaintiff's acute back problems she is speaking about the admittedly sharp drop off in Plaintiff's complaints of pain from the acute period (1998 and 1999) to the relevant period in this case (2000 and later). (Id.) This improvement occurred without significant medical treatment, regardless of whether Plaintiff desired such treatment or not. Furthermore, contrary to Plaintiff's claims, a 2001 x-ray of Plaintiff's lumbar spine showed no abnormalities and supports the ALJ's finding that Plaintiff's condition improved. (R. at 324.)

In his next argument, Plaintiff challenges the ALJ's reliance on a physical therapist, emergency room reports, a post-hearing consultative examination, and Plaintiff's activities of daily living when refusing to grant Dr. Giokaris's opinions controlling weight.

Plaintiff suggests that a physical therapist cannot provide significant medical evidence when determining whether a claimant is qualified to receive benefits. Plaintiff is incorrect. While physical therapists are not generally relied upon to establish an impairment, 20 C.F.R. § 404.1513(a), an ALJ may use evidence from a physical therapist to show the severity of Plaintiff's impairment and how it affects his ability to work. 20 C.F.R. § 404.1513(d)(1).

Plaintiff challenges the ALJ's reliance on Dr. Shermer's post-hearing consultative examination on several grounds. First, Plaintiff alleges that his due process rights were violated because he did not have an opportunity to cross-examine Dr. Shermer and his comments on Dr. Shermer's exam were not included in the record. Next, Plaintiff argues that Dr. Shermer's brief exam is not entitled to more weight than two years of Dr. Giokaris's examinations,

especially in light of the fact that Dr. Shermer did not have current medical tests available to him, as Plaintiff's last MRI was taken in 1999. Again, Plaintiff's arguments fail. As an initial matter, Plaintiff's comments on Dr. Shermer's examination are included in the record at pages 133 to 138. In those comments, Plaintiff states that he has no objection to the consultative examination being admitted as evidence, (R. at 133), but offers his analysis as to why the examination is not entitled to much weight. (R. at 135-36.) It follows that Plaintiff's due process rights were not violated. Next, as stated above, despite Dr. Giokaris's status as a treating physician, the ALJ identified numerous reasons for denying his opinions controlling weight. The ALJ also noted that, despite treating Plaintiff for several years, Dr. Giokaris's treatment notes undermine several of his medical conclusions. Specifically, while Dr. Giokaris completed very detailed reports on Plaintiff's condition on September 15, 2000, February 21, 2001, and July 28, 2001, the remainder of Dr. Giokaris's notes report monthly complaints of pain from October 2001 to July 2002 with practically no comments or analysis of Plaintiff's mental or physical condition. It is not surprising then, that the ALJ found these notes "belie assertions of the frequency of complaints, supportive findings, course of treatment, etc." (R. at 19.)

Finally, Plaintiff alleges that the ALJ placed too much weight on his activities of daily living when rejecting Dr. Giokaris's findings. Plaintiff's activities of daily living suggest that he is capable of greater physical activity than Dr. Giokaris reports. While Dr. Giokaris claims that Plaintiff cannot walk more than one city block, or carry more than ten or fifteen pounds, Plaintiff testified that he walks a few blocks when he does grocery shopping for his mother and carries laundry back and forth to the laundromat (albeit one load at a time). Dr. Giokaris suggests that Plaintiff is dependent on his mother, but Plaintiff receives $200.00 per month to care for her.

Plaintiff also claims that the ALJ wrongly implied that Dr. Giokaris found Plaintiff to be a malingerer, despite Dr. Giokaris's explicit statements to the contrary. The ALJ noted that Dr. Giokaris referred to Plaintiff as "unmotivated." (R. at 20.) Plaintiff argues that "unmotivated" equates to depressed, fatigued and lacking in energy. Even under Plaintiff's definition of "unmotivated," Dr. Giokaris's notation stands in sharp contradiction to Plaintiff's activities of daily living, which include caring for himself and his mother, handling his financial affairs, and spending considerable amounts of time with friends at coffee houses. In sum, it does not appear that the ALJ placed undue weight on Plaintiff's activities of daily living.

For the reasons stated above, the ALJ did not err by refusing to give Dr. Giokaris's opinion controlling weight.

## 2. The ALJ Performed an Adequate Assessment of Plaintiff's Mental Impairments.

Plaintiff challenges the ALJ's assessment of his mental impairments. Specifically, Plaintiff claims that the ALJ erred by (1) placing more weight on the ME's impressions of Plaintiff's mental health than the findings of three examining physicians, (2) failing to consider how Plaintiff's mental and physical impairments might interact, and (3) failing to apply the Commissioner's special technique for assessing mental impairments.

### a. ME's Impressions of Plaintiff's Mental Health

The ALJ placed more weight on the ME's mental health findings than Dr. Giokaris's findings. First, the ALJ noted that Dr. Prieto, Dr. Rubens, and the ME all found Plaintiff to have

much greater powers of concentration and intellectual functioning than Dr. Giokaris. (R. at 18-20.) The ALJ suggested that Giokaris's report of symptoms indicative of psychotic disorders and anti-social behavior were essentially uncorroborated by any other doctors. (Id.) And, as noted above, Dr. Giokaris's treatment notes offer little insight into his impressions of Plaintiff during their monthly meetings.

The one area where the ME differs significantly from the other physicians is with regard to Plaintiff's alleged depression. The ME observed Plaintiff during the ALJ hearing and noted that he often uses the word depression when he is talking about physical pain. On several occasions during the hearing, Plaintiff said that when he has back pain he takes pills for depression, (R. at 415, 417), and that on his good days he has no depression or difficulty breathing. (R. at 419.) Suspecting that Plaintiff did not really know what depression means, the ME asked Plaintiff to define the term. Plaintiff stated that depression is when you are scared and it is hard to breath. (R. at 433-34.) On more than one occasion, Plaintiff referred to his pain and anxiety medication when asked about his depression medication. Based on Plaintiff's testimony and his review of the record and Dr. Prieto and Dr. Rubens's notes, the ME found that, other than some reports of fatigue and difficulty sleeping (which was not a constant problem for Plaintiff), there was little evidence of depression in the record. The ME then concluded that Plaintiff suffers from an anxiety disorder but not depression

Plaintiff suggests that the ME's opinion is not entitled to much weight because, unlike the other physicians, the ME did not examine Plaintiff. As an initial matter, while the ME did not perform psychiatric tests on Plaintiff, he did have an opportunity to observe and interact with Plaintiff. Next, neither Dr. Prieto nor Dr. Rubens is a treating physician, as each met with

- 26 -

Plaintiff one time for about thirty-five minutes. (R. at 257, 284.) In fact, one reason why Plaintiff does not have a treating psychiatrist is because he refused to avail himself of the free psychiatric services at the Fauntas Clinic and first raised depression as a severe impairment at the ALJ hearing. (R. at 425-26, 429-30.) Significantly, however, the ME's analysis is supported by the record. While Dr. Rubens concluded that Plaintiff suffers "adjustment disorder with mixed anxiety and depression," (R. at 286), Dr. Rubens never discussed depression or its symptoms in his report. Similarly, other than concluding that Plaintiff is depressed, Dr. Prieto's only reference to depression or its symptoms reads: "[Plaintiff] also complains of depression, anxiety and panic attacks to the point of having gone to the emergency room for treatment of the panic attacks. Sometimes he becomes so frightened during a panic attack that he has chest pain, feels he cannot breathe and that he is going to pass out and die." (R. at 257.) This account is strikingly similar to Plaintiff's description of depression at the hearing, supports the ME's conclusion, and undermines Dr. Prieto's finding of "major depression." Furthermore, Dr. Gilliland's November 2000 report also noted that Dr. Prieto did not describe symptoms of depression, nor describe observing a depressed affect. (R. at 276.) While not in complete agreement, the reports from Dr. Rubens, Dr. Prieto and the ME stand in sharp contrast to Dr. Giokaris's conclusion that Plaintiff has severe depression with occasional suicidal ideation and symptoms of psychotic disorders. (R. at 20.) It follows that the ALJ had adequate grounds for relying on the ME's testimony.

b.     Interaction of Mental and Physical Impairments

Plaintiff argues that, under *Golembiewski v. Barnhart*, 322 F.3d 912 (7th Cir. 2003), the ALJ is required to consider Plaintiff's mental impairments in conjunction with his physical impairments. Plaintiff argues that his anxiety and depression are triggered by his back pain and, when the two interact, he is incapable of working. The Court rejects this claim.

Having found that one of Plaintiff's impairments was severe, the ALJ needed to consider the aggregate effect of his entire constellation of ailments, including those impairments that in isolation are not severe. *Golembiewski*, 322 F.3d at 918. Plaintiff described his daily activities and stated that when he experiences pain he needs to sit down and relax and take his medications. While Plaintiff has been to the hospital numerous times in the past because of his anxiety attacks, during the relevant times in this case, those episodes were few and far between, (R. at 20), and those records do not suggest that the anxiety was triggered by Plaintiff's pain. Similarly, few of Plaintiff's complaints to Dr. Giokaris about pain are accompanied with complaints of panic attacks. Because the record does not suggest that these two conditions are intertwined, the ALJ did not err when she composed Plaintiff's physical and mental RFCs and found that Plaintiff's medically determinable impairments preclude lifting more than twenty pounds occasionally or more than ten pounds frequently and understanding, remembering and/or carrying out detailed and/or complex instructions. (R. at 21.)


c.     The Commissioner's Special Technique

Plaintiff argues that the ALJ was required to fill out a special technique form in this case. Social Security regulations prescribe that where a claimant presents evidence that he suffers from

a mental impairment, the ALJ must follow a "special technique." 20 C.F.R. § 416.920a(a).
Under the special technique, the ALJ must first evaluate the claimant's pertinent symptoms, signs
and laboratory findings to determine whether he has a medically determinable impairment. 20
C.F.R. § 416.920a(b). The ALJ must rate the claimant's degree of functional limitation in four
broad functional areas: activities of daily living; social functioning; concentration, persistence, or
pace; and episodes of decompensation. 20 C.F.R. § 416.920a(c). The ALJ employs a five-point
scale to rate the degree of limitation in the first three functional areas (activities of daily living;
social functioning; concentration, persistence, or pace): none, mild, moderate, marked, and
extreme. Id. In the fourth functional area (episodes of decompensation), the ALJ employs a
four-point scale: one, two, three, four or more. Id. The last point on each scale represents a
degree of limitation that is incompatible with the ability to do any gainful activity. Id. If the ALJ
rates the degree of functional limitation as "none" or "mild" in the first three functional areas and
"none" in the fourth area, she will generally conclude that the claimant's impairment(s) is not
severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the
claimant's ability to perform basic work. 20 C.F.R. § 416.920a(d). If the claimant's mental
impairment is severe, the ALJ will then determine if it meets or is the equivalent to a listed
mental disorder by comparing medical findings and the ratings of the degree of functional
impairment to the criteria of the appropriate listing. Id. If the ALJ finds that the claimant does
not have a severe mental impairment that meets or equals any listing, the ALJ will assess the
claimant's RFC. Id.

Plaintiff implies that the ALJ's reference to "'B' and 'C' criteria in Exhibit 13F" on page
seventeen of her decision is inadequate because the ALJ failed to list her specific finding as to

the degree of limitation in each of the four functional areas. (Pl.'s Br. at 19.) Contrary to Plaintiff's argument, the ALJ adequately complied with the special technique to evaluate the functional limitations of Plaintiff's mental impairment. Though the ALJ did not specifically mention the special technique, she explicitly relied upon Exhibit 13F, i.e., a Psychiatric Review Technique ("PRT") completed by Dr. Gilliland, and the mental RFC determination made by the ME at the hearing. (R. at 17.) The ALJ specifically references the B criteria in the PRT, which indicates Plaintiff had mild restrictions of daily living; mild difficulties in maintaining social functioning; no difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. (R. at 297.) After further evaluating the testimony and medical evidence, the ALJ adopted the opinions of Dr. Gilliland and the ME that Plaintiff had *moderate* difficulty maintaining concentration, persistence and pace, and that insufficient evidence of repeated episodes of decompensation existed. (R. at 17, 260-61.) The ALJ properly considered the PRT and the opinions of the experts and incorporated her pertinent findings and conclusions based on the technique in her decision. *Dixon*, 270 F.3d at 1177 (consulting physician's opinion may have the advantage of both impartiality and expertise); 20 C.F.R. §§ 404.1527(f); 416.920a(e); SSR 96-6p (State agency physicians are highly qualified physicians who are experts in Social Security disability evaluation.). The ALJ's explicit reliance on these assessments obviates the need for the meticulous level of annotation Plaintiff demands. *Herron*, 19 F.3d at 333 (so long as the reviewing court is able to trace the path of reasoning and is satisfied that the ALJ considered all the important medical evidence, the articulation standard is met). Thus, the ALJ's decision is in compliance with the regulation's requirement of specific findings as to the degree of limitation in the four functional areas.

3.    The ALJ's Credibility Determination is Based on
       Substantial Evidence in the Record.

When assessing a claimant's credibility, the ALJ must consider subjective complaints of

pain. Where a claimant presents evidence of a medically determinable physical or mental

impairment that could reasonably be expected to produce the pain alleged, the ALJ is obliged to

examine and weigh all the evidence, regardless of whether the intensity or persistence of the pain

is substantiated by objective medical evidence. *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th

Cir. 2004). It follows that observations by treating and examining physicians, third-party

testimony, the claimant's testimony and daily activities, functional restrictions, pain medication

taken, and aggravating or precipitating factors may all be relevant to the pain and credibility

assessment. *Herron*, 19 F.3d at 334; 20 C.F.R. §§ 404.1529, 416.929(c); SSR 96-7p. Thus, it is

not sufficient for the ALJ to make a single, conclusory statement that "the individual's allegations

have been considered" or that "the allegations are not credible," nor is it enough for the ALJ to

simply recite the factors described in the regulations for evaluating symptoms. *Zurawski*, 245

F.3d at 887; SSR 96-7p.

In this case, the ALJ determined that Plaintiff's allegation of debilitating pain that

precludes him from working was not supported by the record and was, in fact, belied by his own

admissions. First, the ALJ noted that Plaintiff's MRI showed disc herniation at L5/S1 which

lends support to Plaintiff's complaints of back pain. (R. at 18.) Then, the ALJ examined many

factors in order to evaluate Plaintiff's claims of pain. The ALJ concluded that the objective

medical evidence conflicted with Plaintiff's claim that he is totally disabled and did not support

the existence of limitations greater than those found by the ALJ. (Id.) Specifically, the ALJ

- 31 -

noted that in March 2003, radiculopathy was specifically excluded from Plaintiff's diagnosis, as a neurological exam was negative. (Id.) According to Dr. Shermer's orthopaedic assessment, Plaintiff's lumbar motion was within normal parameters, albeit with pain. (R. at 355.) At the time of the hearing, Plaintiff had not been to the emergency room for back pain in two years. (R. at 344.) Plaintiff then appeared in an emergency room on March 12, 2003, complaining of lower back pain and anxiety. (R. at 368.) Plaintiff was diagnosed with lower back strain. (Id.) At the hearing, Plaintiff, while claiming to be disabled, reported being paid $200.00 per month to care for his mother for the past five years. (R. at 408-09.) Plaintiff stated that his free samples of medication, Tylenol, and Advil help alleviate his symptoms "part of the time." (R. at 414, 416, 433, 435.) Plaintiff reported his ability to watch television for thirty minutes at a time and spend a few hours in coffee shops. (R. at 415-17.) Ultimately, the objective evidence contradicting Plaintiff's claims provides a sufficient reason for the ALJ to grant less credit to Plaintiff's statements concerning his back pain.

### 4.    The ALJ Was Permitted to Rely Upon the VE's Testimony.

Plaintiff's mental RFC describes one limitation: moderate difficulty in maintaining concentration, persistence, and pace. (R. at 17.) At Plaintiff's hearing, the VE testified that there were 4000 general assembly work positions for a hypothetical individual who can lift up to twenty pounds occasionally, ten pounds frequently in a job requiring no bending, twisting, detailed or complex tasks, and allowing the individual to change positions every forty-five minutes. (R. at 458-59.) Plaintiff argues that the VE's testimony cannot constitute reliable

- 32 -

evidence because the ALJ's hypotheticals did not include the RFC finding that Plaintiff has moderate difficulty in maintaining concentration, persistence, and pace.

An ALJ may rely on a VE so long as the VE offers reliable testimony. For a VE's testimony to be reliable the hypothetical questions posed to the VE must include all limitations supported by medical evidence in the record. *Young*, 362 F.3d at 1003; *Herron*, 19 F.3d at 337. However, where the VE had the opportunity to learn of the claimant's limitations through an independent review of the medical records or through questioning at the hearing, the VE may offer reliable testimony even if the hypotheticals did not include every limitation. *Id.*

In this case, the VE had the opportunity to review the record and was present throughout the ALJ hearing, (R. at 457), so the ALJ may impute knowledge to the VE of everything in the exhibits and testimony. *Young*, 362 F.3d at 1003; *Herron*, 19 F.3d at 337. As a result, even though the ALJ's hypothetical did not include "moderate difficulty in maintaining concentration, persistence, and pace," the ALJ could properly assume that the VE included all of Plaintiff's limitations in his assessment of the number of jobs Plaintiff can perform, *Young*, 362 F.3d at 1003, and was permitted to rely on the VE's testimony when finding Plaintiff not disabled.

## IV. Conclusion

For the reasons set forth above, the Court affirms the Commissioner's final decision and

- 33 -

grants her motion for summary judgment. For the same reasons, Plaintiff's motion for summary
judgment is denied.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
Dated: August 14, 2006.                              United States Magistrate Judge

Copies have been mailed to:

FREDERICK J. DALEY, JR., Esq.
Daley, DeBofsky & Bryant
One North LaSalle Street
Suite 3800
Chicago, IL  60602

Attorney for Plaintiff

MR. PATRICK W. JOHNSON
Assistant United States Attorney
219 South Dearborn Street
Suite 500
Chicago, IL  60604

Attorney for Defendant